On the completion of the buildings, IRET alleged that it discovered defects in Miller Architects & Builders' design and work, and Miller put Westfield on notice that these claims had been raised. Miller also filed a mechanics lien on the apartment building seeking to be compensated for work that it claimed still needed to be paid for, and IRET eventually commenced an arbitration. Once we get down to sort of the bottom of it, I have, I think, one question. I don't know if it's preliminary or not, but do you agree with when Opposent Counsel asserts that we must affirm the decision that your client had a duty to defend if even one claim asserted by IRET was arguably covered? The Minnesota Supreme Court has basically said there's two duties in insurance law, the duty to defend. I know that. Yes, and they do say that the duty to defend one claim requires or imposes a duty to defend all claims. And that's pretty universal in the states in the Eighth Circuit, in my experience. Yes, and so that would be correct. So all of this, all of these pages and pages of briefings about all the different kinds of claims, we can put aside if there is one that's arguably covered? If there's one that is arguably covered. You know, that tells me you've got a big hill to climb. I do have a big hill to climb, but... How in the world can we get rid of all of those five categories? Well, certainly. You do them one at a time, but you've got to win all five, right? You do have to win all five. Okay. But, yeah, so I can win four out of five and then there would still be the duty to defend one, which brings the rest along with it. But we do win all five. There are two basic questions that once you boil down to all of the exclusions in the policy, we're asked here. One is, when a contractor is hired to construct a building on real property, is the building the particular part of the real property that the contractor is working on? And the district court said no. And then the second is, is an incomplete building complete within the meaning of an insurance policy? And the district court, again, said that an incomplete building was complete. Because those were incorrect answers, this court should reverse. Simply put, we have, I'll move first to that particular part language. Well, let's talk about the complete issue. Okay. Why isn't it arguably, the work arguably completed? Well, because... At least Miller's work. Miller was hired to construct a two-building apartment complex on the lot, and they didn't. Yeah, but what does complete mean? Does it mean his work? It means the work... Or does it mean the project? I would think it means his work in an insurance coverage situation. Well, it would mean the work that you were contracted to build. And in this case, they were contracted to build the apartment complex. You've been replaced. Yeah. You don't have the contract anymore. You don't have the contract anymore, but you didn't complete the work you were hired to do. All right. And what's your best case on the complete question? State versus William O'Neill and Sons. And this is a Minnesota Supreme Court case. It's statutory interpretation, but the Minnesota Supreme Court said that the language in the particular statute, which said the work called for in your contract is complete, it said that language was unambiguous and that it was applying the plain language. So it didn't resort to statutes or canons of construction, didn't resort to ambiguity or resolving ambiguity in one way or the other. It addressed it on the plain language. And it said the work you were hired to do was to build this bridge. That's the work that we are focused on, not any arbitrary timelines. And then I think we provided you with citations to a couple of other jurisdictions that have addressed this particular question. So to get back to Judge Loken's question, this isn't about the way I read some of these, and this is an impenetrable contract. I'm sure it's a standard form. They all are. But it's very difficult to read these exclusions. But the way I sort of read it was the same way Judge Loken read it, which is when you're still on the project, you have an opportunity to fix it, right? But if your work is complete, your work, Miller's work is complete, you don't have an opportunity to fix it anymore. You can't just go in the middle of the night and go fix your work. And so it's different in that particular circumstances. That's not how you read the contract. No. It's the scope of the contract is the completion aspect that we're reading. And if you read the definition of the products completed operations hazard, it has sort of four definitions. If you look at the first and the third one, the first one is when the work called for in your contract is complete. And then the second one is when you pass the project on to somebody other than another contractor or subcontractor who then puts it to its intended use. Well, in this case, what Miller did is they ended up passing it to another contractor. They passed it on to Northridge. Northridge comes in. They redo all that. IREC did. Well, they pass it to IREC and IREC passes it to Northridge. Okay. No, but no, they, no, I think the record is that they did pass it to Northridge. IREC assumes the architecture agreement, which is a separate agreement with a separate defendant. Our insured, and this is a little bit of confusion in the record, but Miller Architects and Builders is the general contractor. They hire an affiliated company, Miller Architects, Inc. to do the architecture work because I think in North Dakota, you can't have the architecture work done by the general contractor. And so the assignment- Not even in design build? I'm sorry, Judge Loken, I don't, I don't, I'm an insurance, I'm an insurance attorney, not a North Dakota design build attorney. Well, let me ask you this. The one I think you have the hardest time with is the roof. I think that's by far the strongest claim of the other side. And another way to read complete is completion of individual parts of the project. So here, the roof was clearly complete. The damage affected not only the roof, but it affected the interior, affected like the electrical system of the apartment complex. So tell me what particular exclusion applies to the roof. So the roof, and again, we're talking about the scope of the contract. And so the roof contractor, to the extent that they completed the work that they had, which was complete the roof, and they were moved off and they moved on, then their part of the project was complete. But Miller's part of the project was the whole building, roof to foundation. And so they weren't done at that point. And so while the roofing subcontractor would arguably have signed, or would have signed a contract with Miller, basically making them an additional insured under the roofing subcontractor's insurance company, and the roofing subcontractor at that point would have an obligation to defend Miller. Here, it's still all one building. And this gets to sort of that particular part language. The particular part that you were working on for Miller, and the majority rule in these insurance cases is that the particular part is you look at the scope of the contract. If you're hired to build a building on a lot of land, the particular part that you're building is the entire building. If you're hired to build the roof on the building, then that's sort of the particular part that you're working on. And so in that case, if the roof subcontractor does the roof poorly and the roof leaks and damages the interior, they're responsible for the damage to the work of other subcontractors or contractors. But because Miller's responsible for the entire building, that's why the roof is not sort of what triggers completion for Miller. So it really gets back to the whole building point. And that would be the only reason, at least with respect to the roof, that it would be excluded. Otherwise, it would not be excluded under the terms of the policy. Well, and I think the Minnesota Supreme Court or the Court of Appeals, I think, in one of the cases that we cite to indicate that sort of cosmetic marring or sort of minor problems are not the sorts of things that are going to trigger an insurance contract. We're talking about when the policy covers subcontractor defects, right? That's part of it. And so... And so the completion issue, as I understand it, is once it's completed, we don't have the question of you work. We have the products completed coverage, which permits, includes coverage for subcontractor defect. Have I got it wrong? So you've got the, I think it's the J6 exclusion, which is the sort of while you're, before it's a products completed operations hazard, if it's damage, then it's excluded even if it's subcontractor damage. Once it's in the products completed operations hazard, there's exclusion L, I believe, which is the your work exclusion. And that one has an exception for the work of subcontractors. I thought it was undisputed that L doesn't apply. We're talking J5 and J6. Well, if it's complete, J5 doesn't apply. L would apply, but then L has an exception for subcontractors. And so, and I think, let me pull up the... L does not apply to subcontractor work. But I've gotten my notes. Yep. So L, damage to your work. This exclusion does not apply to the damaged work of, and so this is L, performed on behalf of your subcontractor. But the exclusion ordinarily would apply to the products completed operations hazard. And so I think what happens is that exclusion J6 does not contain an exception for the work of a subcontractor. And so that's why completion becomes a dividing line because... My notes from your opposing counsel's brief is the products completed coverage expands coverage to include damage arising after defendant's work is done. Well, there's no... And it does not, an exclusion L isn't therefore what we're dealing with here. We're dealing with that products completed. Well, there's... Completion, the issue, completion issue just turns on whether that coverage has been triggered. Well, and it's a, I think the products completed operations hazard in the policy is a definition. So it's a term that's, it's a defined term. It's not a sort of separate coverage part that's elsewhere, although there's a separate limit that applies to that type of hazard. And so really what we're looking at is which of these two exclusions we're in. If we're in J6, then there's no exception for subcontractor work. And we agree that we're in J6 and that there's no exception for subcontractor work and there's no coverage. We disagree that we're sort of in J, in L. We don't think we're in L either, but in L they lose or they would win, but we don't think we're in L. And I see I have a minute and a half. I'd like to reserve some time for rebuttal if I have the opportunity, but I'm happy to address any further questions you may have. Mr. Orman. May it please the court. My name is Jesse Orman. I represent Miller Architects and Builders. And I see the court's gotten right to the heart of the issue here. Judge Strauss called the insurance policy or the contract at issue here impenetrable. I think that's right. And all the ties at this point go to the runner. The runner here is Miller Architects and Builders, the insured. I'll tell you, that gets nowhere with me. I mean, these are sophisticated business parties negotiating or not negotiating. If they're not negotiating, their brokers are probably negotiating. And this is a standard form contract, more or less. I mean, I've seen them in multiple jurisdictions in the Eighth Circuit. That's right, Your Honor. It is a standard form contract. It's the policy controls. It does. As badly as all of us may think it was written. That's right. And it's been that way for 30-plus years at this point with all the construction. That doesn't mean the insurers lose every time these complex exclusion issues arise. No. They don't lose every time. However, they lose here. They lose here because the work is not subject to J-5, to J-6. Even if it is subject to J-6, the exclusion in J-6 for products completed operations applies. And that's the order that we need to go through the coverage analysis here. There's no dispute that property damage occurred. There's, I think, some dispute in the brief regarding occurrence. But I'm going to rest on the brief on that issue. The real action is whether J-5 applies, J-6 applies. And we'll start with the roof because that is the best. It is our best case. Frankly, I think it's equally as good as the differential settlement issue caused by work by the excavation subcontractor first in time. Then you have the building built over that excavation work, which then arguably, allegedly settled after Miller was off the project, cracking the drywall and cracking other interior finishes. So with respect to J-5, J-5, I think as counsel admitted, just doesn't apply here when the work is done. That's not the language of J-5, though. The language of J-5, which we have to apply, is our performing operations. As long as the occurrence and the resulting property damage occur sometime when the contractor at issue, is no longer in a status that can be called our performing operations, present tense, as long as the damage occurs after that, J-5 doesn't apply. So we have a roof that is built, time one. Time two, Miller Architects and Builders is terminated. Time three, it leaks causing damage internally to electrical finishes and other finishes. J-5 doesn't apply. Same analysis works with respect to the differential foundation, movement, and cracking. Frankly, the same analysis applies to the transition strip. It's damaging a third-party property. Now, J-6 is similarly impenetrable, but I think we can just stop even before getting to the more complicated issue of product's completed operation and whether the work is complete. It's because J-6 only applies when the property damage is caused by work that's performed on that particular part of real property and when it is incorrectly performed on it. There is no allegation, and there never was, that the electrical work that was damaged by the roof leaks was incorrectly performed. Since there's no allegation that the electrical work was incorrectly performed, J-6 doesn't apply, period. Don't need to get to the exception in the product's completed operations hazard. Similarly, there's no allegation that the drywall work was incorrectly performed, causing it to crack. The allegation is that something was wrong with the excavation and the work underlying the building. On the transition strip, which you mentioned as the third category, opposing counsel mentioned the Minnesota Supreme Court precedent that talks about the fact that it can't be cosmetic. It needs to be much more major than that. My understanding is this was about marks that were left by cars that were hitting the transition strip and damaging the concrete or creating marks on the concrete. Is that enough to overcome that cosmetic limitation that the Minnesota Supreme Court has recognized? Your Honor, I think what the issue is is that is how the parties came to learn about the issue, that there were marks caused by cars, construction trucks, vans, other vehicles hitting the concrete. It's not so much that the concrete at the base of the garage was damaged. It's that the third party's property, the cars, the vans, the trucks, the vehicles, were damaged. Okay. In that situation, it's not cosmetic. At least it wouldn't be if it was my car. So I do want to spend a little time on products completed operations and whether the work was complete. Again, I don't think this court needs to get there. However, if it does, the issue is whether Millerec and Texan Builders' work was complete. The court asked opposing counsel what the best case he had on the complete issue was. He cited the William O'Neill case from the Minnesota Supreme Court from, I think, the 40s. And the issue in that case has nothing to do with this one. But even if it did, it's not the same language. The language at issue here is whether all the work called for in your contract has been completed. William O'Neill, language was different. It was whether the work was, in all things, completed. And I could see how you could perhaps read that differently than whether the work called for in the contract was complete. And here, very importantly, this was a design-build contract. The beginning, when IRA signed the design-build contract with Millerec and Texan Builders, the contract that is in the record, the construction project was a little morphous. It was just an upscale apartment building with approximately 240 units. The design-build contract contains provisions that explain how the parties are going to go from that, maybe 10-page written contract, that's all that is there, to develop a design that the owner approves, to price it, maybe enter into a fixed price option to complete it for a price certain. That didn't happen in this case. Instead, the contract provided that once you get the plans and the specifications completed, the contractor gets paid for whatever the cost of that work is going to be, plus a fee. And the contract contains standard construction contract provisions allowing the scope of the work to change. They could have decided they wanted 340 units. Could have decided they wanted 140 units. It would be perverse to forfeit coverage under completed operations coverage under this policy if a change order had been made because IRA decided it didn't want quite as big of a building that it did when it originally signed the contract. I don't see that as any different than when IRA exercised the pre-negotiated right to terminate the contract for convenience, which is effectively a walk-away. No cause, no fault, could have been for any reason or no reason. In that circumstance, when you look at the words, when all the work called for in your contract has been completed, I don't see any other way to interpret that than looking at the entire contract, all the terms and conditions including all the process that a design-build contract like this one implied. Someone asked a question about subpart C, or I think John DiMenderos, Counsel for Westfield, addressed subpart C of the exclusion in response to a question regarding whether the work at issue here was put to use by someone else. Because under subsection C, or within the products completed operation hazard, if part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project, IRET took control of the project after it terminated Miller Architects and Builders. IRET then hired another general contractor to complete the work and other subcontractors. I'd submit that under these facts, IRET put the project to its intended use after the termination for convenience and then turned it over to another contractor. So I think we went under subpart C. What about this MAI to contract complexity? I don't think it's relevant here, Your Honor. Well, my understanding is I'm sure Miller cooperated in the handoff after the termination for convenience. And so there may have been a direct, I don't know if the contract was transferred or assigned. When you say IRET terminated, kind of a joint termination for convenience, then they've got to have a new contractor. And Northridge comes in and stands in the shoes of the replacement general contractor. How do you follow the paper trail there? I can take you through the paper trail. So what happened is that in December, I think it was the 4th of 2014, IRET called and emailed, and this is in the record, Miller Architects and Builders informing it that it was terminated. In early January, the parties executed a document. The document was an assignment. It was an assignment of the architectural contract because Miller Architects and Builders retained a separate company, Miller Architecture, Inc., to be the designer of record. When the design-build contract was terminated for convenience, it contains provisions like most do that allow the parties to assign over subcontracts, including subconsulting agreements like this one where you have a designer that is working for the design builder. Those got assigned over to IRET in early January 2015. In that assignment, the parties confirmed that the termination was under Section 9.3, which was for convenience. Then, later in March, IRET attempted to retroactively convert its... But just stay with January. I know what happened later on. So then what's the paper trail to Northridge? What does Northridge sign on to or is assigned or whatever? This is a problem where I know too much about the case that I don't believe is in the record before this court. I think what is in the record before this court is that IRET hired, doesn't say how. I don't believe the contract is in the record, hired Northridge as a replacement general contractor. So that contract isn't in the record? I don't believe so. IRET and Northridge? Right. What is in the record are the allegations. So it was not simply an assignment or transfer of the IRET-Miller agreement? Absolutely correct, Your Honor. It was not. That helps. Thanks. Okay. Again, getting back to alternate paths, I think we can find coverage any number of ways here. We can find coverage by analyzing and applying whether J-5 applies here at all. It doesn't. I don't think there's much dispute. They didn't certainly push very hard in the briefing on whether J-5 applies because it's only for present tense kind of occurrences. Under J-6, the Tibke and Lowery cases we cited in the briefs, I think, are the best example of how those provisions should be construed, which is narrowly in giving effect to each part of the phrase. Here, because the work was not incorrectly performed on the electrical work that was damaged inside and the drywall and other interior finishes, which cracked. J-6 just doesn't apply, and that's it. Now, obviously, if we get to completed operations coverage, it's an issue of first impression for the Minnesota Supreme Court, and it's an issue of first impression for this Court as well as it relates to this issue. Under the circumstances, the Court's to do its best job guessing what the Minnesota Supreme Court would do under the similar circumstances. And to bring us back to the beginning, Your Honor, Minnesota has not hesitated to strictly construe these contract provisions against the drafters, in this case the insurance company, unless Your Honors have any more questions. Let's state precisely what's the issue of first impression. Whether termination for convenience constitutes completion for purposes of the product's completed operations hazard under the CGL 1986 standard form policy. Thank you, Your Honor. Mr. Madero, you still have some time. Thank you, Your Honors. I think going back to the termination for convenience issue, termination for convenience is not a change order. It's not a modification of the contract. It's just the exercise of contractual right. And so the idea that this termination for convenience somehow modified the original scope of the contract isn't supported. And I think we did provide more than just a 1929 Supreme Court case. We did cite to AW Builders, Inc., the Clare Don decision and the McGowan decision that are from other jurisdictions, but they do directly address the termination of a contract. And those are all from this century. So to the extent that age is not something that the court prefers, you have some more recent cases to affirm on or reverse on. The other point I'd like to address is this intended use under subpart C. The intended use of the apartments was to rent to individuals. So even if IRET took over the property, the property was not in a condition where it could be put to its intended use at the time that IRET took it over. They had to hire somebody to actually complete the buildings in order to put the buildings to their intended use. I think the third-party property regarding these trucks or cars that were scratching the concrete, those claims aren't before the court. We only defend the claims that are made, not the claims that potentially could be made in the future. And I'd ask the court not to pay too much attention to those. Those are ghost vehicles. And I would ask the court to rate. We're at the duty to defend stage. Yes. What I just heard you say is that that indemnity question is not before us. It's not. We're talking about arguable coverage. We're talking about arguable coverage. But the claims for those actual vehicles have not even been made. So there's no question as to whether there's a duty to defend a claim that hasn't been made. And so the only claim — IREC has made the claim. IREC may not be able to prove the claim because no cars got hurt. I don't know. And in their 65 itemized cost claims, there was no actual request for money damages to be paid for damage to those vehicles. The only request that was made by IRET was for the installation of the transition strips. And so no claim was made for the actual vehicles. And if the court has nothing further, I see my time is up, and I'd ask the court to reverse. Thank you. Very good. Thank you, counsel, for argument, good argument in a complex case. We will take it under advisement. Please call the last case for argument.